## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ALEXANDRA STEINHOFF,**　　　　　　　CASE NO.:

　　　*Plaintiff,*

**v.**

**WAKEFIELD & ASSOCIATES, LLC,**
**BANNER HEALTH D/B/A BANNER**
**CASA GRANDE MEDICAL CENTER,**
**TRANS UNION, LLC, EXPERIAN**
**INFORMATION SOLUTIONS, INC.,**
**and EQUIFAX INFORMATION**
**SERVICES, LLC,**

　　　*Defendants,*

_____/

## PLAINTIFF'S COMPLAINT
## JURY DEMAND

1.　　Plaintiff, ALEXANDRA STEINHOFF (hereinafter "Plaintiff" or "Ms. Steinhoff") brings this action against Defendants WAKEFIELD & ASSOCIATES, LLC, (hereinafter "Wakefield"), TRANS UNION, LLC ("Trans Union"), EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian") and EQUIFAX INFORMATION SERVICES, LLC ("Equifax") for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et. seq.* (hereinafter "FCRA").

2.　　Plaintiff further alleges violation of the Florida Consumer Collection Practices act, Florida Statute §559.72 *et. seq.* (hereinafter "FCCPA") against BANNER HEALTH d/b/a BANNER CASA GRANDE MEDICAL CENTER ("Banner Health") and Wakefield.

3.     Plaintiff further alleges violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (hereinafter "FDCPA") against Wakefield and states the following in support:

## JURISDICTION AND VENUE

4.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

5.     Defendants' voluntary contact with Plaintiff in Florida made it foreseeable that they would be hailed into a Florida court. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

6.     Venue here is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in Orange County, Florida.

## PARTIES

7.     Plaintiff is a natural person who, at all times relevant to this action is and was a resident of Orange County, Florida and is a "consumer" as defined by 15 U.S.C. § 1681a(c), 15 U.S.C. §1692a(3) and Florida Statute §559.55(8).

8.     Defendant Banner Health is an Arizona nonprofit corporation with a principal place of business located at 2901 North Central Avenue, Suite 160, Phoenix, Arizona 85012. Defendant Banner Health operates Banner Casa Grande Medical Center located at 1800 East Florence Boulevard, Casa Grande, Arizona, 85122.

9.     Defendant Banner Health is a "debt collector" within the meaning of Florida Statute §559.55(7).

10.     Defendant Wakefield is a Colorado limited liability company and registered to conduct business in the State of Florida with a principal place of business at 830 East Platte Avenue, Suite A, Fort Morgan, CO 80701.

11.     Wakefield is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) and Florida Statute §559.55(7).

12.     At all times material hereto, Wakefield regularly collects or attempts to collect debts for other parties, and is a "debt collector" as defined under 15 U.S.C. 1692a(6).

13.     Wakefield uses instrumentalities of interstate commerce for the purpose of furnishing information on specific trade accounts to the three national consumer reporting agencies, Trans Union, Equifax, and Experian (collectively "credit reporting agencies").

14.     These instrumentalities of interstate commerce are largely electronic, written, or telephonic communications which has effects on consumers and their credit reports within the state of Florida.

15.     Defendant Trans Union is a limited liability company incorporated under the laws of the State of Delaware, whose members are citizens of the state of Illinois. Trans Union is authorized to do business in and regularly conducts business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

16.     Defendant, Experian is an Ohio corporation incorporated under the laws of the State of Delaware. Experian is authorized to do business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

17.     Defendant, Equifax is a Georgia limited liability company incorporated under the laws of the State of Delaware. Equifax is authorized to do business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

### *Long- Arm Jurisdiction*

18.     Florida's long-arm "appl[ies] to defendants committing tortious acts outside the state that cause injury in Florida." *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999). Accordingly, the long-arm statute confers personal jurisdiction over a nonresident defendant who is alleged to have committed a tortious act in Florida, which causes injury to a plaintiff. *Id.* at 1216. "[A] nonresident defendant may commit a tortious act within the state by electronic, written, or telephonic communication into Florida so long as the cause of action arises from such communication." *See Smith v. Trans-Siberian Orchestra,* 728 F. Supp. 2d 1315, 1321 (M.D. Fla. 2010).

19.     The purpose of the FCRA is to safeguard against the improper reporting of information on a credit report either by the credit reporting agency or

by the furnisher of credit information. See *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1074 (9th Cir. 2001) (reversing a dismissal for lack of personal jurisdiction on an FCRA claim while stating the "mental distress can only be felt where Plaintiffs' 'sensibilities' reside -that is, Nevada."). Numerous courts have found personal jurisdiction in FCRA cases where the plaintiff resides and was injured by an out-of-state defendant's actions. *See Marcus Forbes v. Concord Advice, LLC et al.*, No. 8:19-cv-02980-VMC-CPT, Dkt. 73 at 16-18 (M.D. Fla. Apr. 21, 2020) (listing cases consistent with personal jurisdiction over nonresident defendants in FCRA cases).

20.     Long-Arm jurisdiction exists under the FCRA claims made against Wakefield and the credit reporting agencies because Ms. Steinhoff resides in the area where the effect of the communications was felt.

21.     Additionally, specific jurisdiction exists over Wakefield under Fla. Stat. 48.193(1)(a)(2) because it committed out-of-state acts, that are codified torts under the FCRA and FDCPA which have caused damage to Plaintiff in Florida.

22.     Personal jurisdiction exists over Wakefield because Plaintiff lives in the forum where he was injured by its actions. *See Koch v. Lake City Credit, LLC*, 6:19-cv-667-Orl-41GJK, 2019 WL 3719457, at *5 (M.D. Fla. July 23, 2019) (citing *InternetSols. Corp. v. Marshall*, 39 So. 3d 1201, 1208 (Fla. 2010) (nonresidents can commit tortious acts in Florida by virtue of telephonic, electronic, or written communications into Florida)). "[S]uits may be brought where a debtor receives a communication from a debt collector located elsewhere where the transmittal of

those communications is claimed to have violated debt collection laws." *See Alecca v. AMG Managing Ptnrs., LLC*, No. 3:13-cv-163, 2014 WL 2987702, at *6 (M.D. Fla. Jul. 2, 2014) (quoting *Sluys v. Hand*, 831 F. Supp. 321, 324 (S.D.N.Y. 1993).

23.     Accordingly, Wakefield has created minimum contacts with this Forum by virtue of their telephonic, electronic, or written communications into Florida which violated the FCRA and FDCPA.

## STATUTORY FRAMEWORK
### THE FCRA

24.     The Fair Credit Reporting Act, 15 U.S.C. §1681 *et. seq.*, was originally enacted in 1970 for the purpose of regulating the collection, dissemination, and use of consumer credit information.

25.     Congress found that "[i]nnacurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." *See* 15 U.S.C. §1681(a)(1).

26.     "The aim of the Fair Credit Reporting Act is to see that the credit reporting system serves the consumer as well as the industry. The consumer has a right to information which is accurate; he has a right to correct inaccurate or misleading information; he has a right to know when inaccurate information is entered into his file; he has a right to see that the information is kept confidential and is used for the purpose for which it is collected; and he has a right to be free from unwarranted invasions of his personal privacy." The Fair Credit Reporting

Act seeks to secure these rights." Hearings on S. 823 Before the Subcomm. on Financial Institutions of the S. Comm. on Banking and Currency, 91st Cong. 2 (1969).

27.     A "furnisher of information" provides information about consumers' credit history to credit reporting agencies. *See* 15 U.S.C. §1681s-2.

28.     "Furnishers of information" under the FCRA, pursuant to 15 U.S.C. §1681s-2(b) to conduct a reasonable investigation into each of the written disputes that it receives from the credit reporting agencies. *See Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016).

29.     Congress also found that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(3),(4).

30.     The FCRA requires credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of" consumer reports. 15 U.S.C. § 1681e(b). If a consumer disputes information contained in their credit report, the FCRA requires a credit reporting agency to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on

the date on which the agency receives the notice of the dispute from the consumer or reseller." *See* 15 U.S.C.S. § 1681i(a)(1)(A).

31.     In performing the reinvestigation, the FCRA requires a credit reporting agency to "review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information." *See* 15 U.S.C.S. § 1681i(a)(4).

32.     If the disputed information is inaccurate or incomplete or cannot be verified, the consumer reporting agency "shall...(i)  promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii)  promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer." *See* 15 U.S.C. § 1681(a)(5)(A)(i),(ii).

33.     The FCRA provides a private right of action against any person that violates the provisions of the FCRA. *See* 15 U.S.C. §§ 1681o, 1691n.

34.     If the violation is negligent, the FCRA allows the consumer to recover actual damages (§ 1681o(a)); however, if the violation is willful, the consumer may recover any actual damages or statutory damages from not less than $100.00 and not more than $1,000. *See* 15 U.S.C. § 1681n(a).

35.     Under the FCRA, the term "consumer report" generally refers to any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is

used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:

   a.   credit or insurance to be used primarily for personal, family, or household purposes;

   b.   employment purposes; or

   c.   any other purpose authorized under section 1681b of this title.

*See* 15 U.S.C. § 1681a(d)(1).

36.   The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

### *National CRAs and Furnishers Communicate Consumer Disputes and Responses via the E-Oscar Reporting Platform*

37.   The FCRA requires credit reporting agencies to implement an automated reinvestigation system through which furnishers of information to the CRAs may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(D).

38.   To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the credit reporting agencies to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

39.     The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. *See* http://www.e-oscar.org/ (last accessed April 11, 2024).

40.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id.*

41.     The credit reporting agencies provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

42.     If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the credit reporting agency that sent the ACDV, but with all other credit reporting agencies to whom the furnisher reported that information. *See* 15 U.S.C. § 1681s-2(b)(1)(D).

43.     The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating credit reporting agency. *See* https://www.e-oscar.org/gettingstarted (last accessed April 11, 2024).

44.     Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

45.     Trans Union, Experian, and Equifax each require data furnishers that report to them respectively to register with and use e-OSCAR, and state that e-OSCAR is "in compliance with FCRA and Metro 2 standards." See, https://www.transunion.com/data-reporting/support-teams        (last accessed March 27, 2024).

### *Credit Risk Scores aka Credit Scores*

46.     The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by the credit reporting agencies. *See* https://www.myfico.com/credit-education/credit-scores (last visited April 11, 2024).

47.     The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id.*

48.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, Supervision and Examination Manual, Version 2(October 2012), p. 99, archived at https://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf (last accessed on April 11, 2024).

49.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score;

debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* https://www.myfico.com/credit-education/whats-in-your-credit-score (last accessed April 11, 2024).

50.     The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

51.     Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

52.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. For example, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

53.     The Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. *See* https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report archived at https://perma.cc/9TQN-S5WP (last visited April 11, 2024).

*The CDIA Metro 2 Credit Reporting Standards*

54.     The reporting of consumer credit information, by credit reporting agencies and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers by giving them access to loans and bank products that they need. *See* https://www.cdiaonline.org/for-consumers/credit-reporting-overview/ (last visited April 11, 2024).

55.     Moreover, the significance of credit reporting and the value attached to one's "credit in this day and age is one of his most valuable assets and without it, a substantial portion of the American people would be without their homes, washing machines, refrigerators, automobiles, television sets, and other mechanical paraphernalia that are now regarded as necessities of life." *See Am. Fire & Cas. Co. v. Davis*, 146 So. 2d 615, 619 (Fla. 1st DCA 1962)."

56.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

57.    Because consumer credit reporting information is such sensitive data that has far-reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

58.    On May 20, 2015, Ohio Attorney General Mike DeWine and thirty (30) other state attorneys general announced a national settlement ("The Settlement") with the CRAs. Attorney General DeWine Announces Major National Settlement with Credit Reporting Agencies, Ohio Att'y Gen. (May 20, 2015), https://www.ohioattorneygeneral.gov/Media/News-Releases/May-2015/Attorney-General-DeWine-Announces-Major-National-s#:~:text=We%20are%20announcing%20a%20comprehensive,because%20of%20an%20inaccurate%20credit (last visited April 11, 2024).

59.    The Settlement implemented numerous reporting standards, including the Metro 2, data reporting format. See Assurance of Voluntary Compliance/Assurance of Voluntary Discontinuance, In the Matter of Equifax Info. Servs. L.L.C., Experian Info. Sols., Inc., and TransUnion L.L.C., § IV (E)(2)(May 20, 2015).

60.    To further assist credit reporting agencies and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to credit reporting agencies and data furnishers.

61.     The CDIA's extensive training and support offerings include FCRA certification programs for both credit reporting agencies and data furnishers, to assist each in maintaining compliance with FCRA regulations.

62.     If the standardized methods proscribed by the CDIA are not followed, FCRA certification can be revoked for failure to adhere to such standards.

63.     In cooperation with the major credit reporting agencies, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year. *See* https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/ (last accessed April 11, 2024).

64.     The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and Trans Union, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete, and timely data, and has developed the Metro 2 standards. *See* https://www.cdiaonline.org/metro-2/ (last visited April 11, 2024).

65.     To ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the "Metro2 standard") for reporting consumer accounts that is "designed to standardize a wide range of credit information while complying with federal laws and regulations for credit reporting." *Id.*

66.     15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute, 15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

67.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

68.     The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure compliance with their respective duties to maintain complete and accurate information under the FCRA.

69.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

70.     The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

16

71.     As an integral aspect of its duties under the FCRA, Wakefield is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

72.     At all times relevant hereto, Wakefield adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

73.     Furthermore, at all times relevant hereto, Wakefield incorporated, warranted, and or represented to the credit reporting agencies to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

74.     As an integral aspect of its duties under the FCRA, Trans Union is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Trans Union produces reports; the requirement to maintain reasonable procedures extends to Trans Union's handling and reinvestigation of disputed information.

75.     At all times relevant hereto, Trans Union adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

76.     At all times relevant hereto, Trans Union has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

77.     As an integral aspect of its duties under the FCRA, Experian is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Experian produces reports; the requirement to maintain reasonable procedures extends to Experian's handling and reinvestigation of disputed information.

78.     At all times relevant hereto, Experian adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

79.     At all times relevant hereto, Experian has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

80.     As an integral aspect of its duties under the FCRA, Equifax is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Equifax produces reports; the requirement to maintain reasonable procedures extends to Equifax's handling and reinvestigation of disputed information.

81.     At all times relevant hereto, Equifax adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

82.     At all times relevant hereto, Equifax has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

**The FDCPA**

83.     The FDCPA provides, in relevant part: A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: (2) The false representation of -- (A) the character, amount, or legal status of any debt ..." *See* 15 U.S.C. § 1692e.

84.     A consumer has a right under the FDCPA to receive information from a debt collector that is not "false, deceptive, or misleading." *See Pralle v. Cooling & Winter, LLC*, No. 2: 16-cv-865-FtM-99CM (M.D. Fla. May 2, 2017).

85.     The FDCPA defines the term "consumer" as "any natural person obligated or allegedly obligated to pay any debt." *See* 15 U.S.C. § 1692a(3).

86.     The FDCPA defines the term "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *See* 15 U.S.C. § 1692a(5).

87.     The FDCPA defines the term "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *See* 15 U.S.C. § 1692a(6).

88.     "The FDCPA does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute." *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010) (citing 15 U.S.C. § 1692k).

89.     For the purposes of the claims brought in this action, the applicable standard under the FDCPA in the Eleventh Circuit is "the least sophisticated" consumer test. *See Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1175 (11th Cir. 1985) (adopting the test enunciated in Exposition Press Inc. v. FTC, 295 F.2d 869 (2d Cir. 1961)).

90.     The principles underlying the FDCPA must be implemented for "the public— that vast multitude which includes the ignorant, the unthinking and the credulous." *See Jeter*, 760 F.2d at 1172-73 (internal citations omitted).  The "fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." *Id.* at 1173 (internal citations omitted).

91.     There is only one affirmative defense to liability for a violation of the FDCPA, the "bona fide error" defense. *See* 15 U.S.C. §1692k(c).

92.     To take advantage of this defense, the defendant must show by the preponderance of the evidence that its violation of the Act was not intentional, was a bona fide error, and occurred despite the maintenance of procedures reasonably adapted to avoid any such error. *See Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1352-53 (11th Cir. 2009).

**The FCCPA**

93.     The FCCPA's goal is to "provide the consumer with the most protection possible." *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing Fla. Stat. § 559.552).

94.     The FCCPA provides that no person shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." *See* Fla. Stat. § 559.72(9).

95.     "The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper, including enjoining the defendant from further violations of this part." *See* Fla. Stat. §559.77(2).

96.     As a consumer, Ms. Steinhoff has a private right of action against Banner Health and Wakefield pursuant to Florida Statute §559.77(2), which provides that "[a]ny person who fails to comply with any provision of s. 559.72 is liable for actual damages and for additional statutory damages . . . not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff." (omissions added).

## FACTUAL ALLEGATIONS

97.     On or about December 24, 2021, Ms. Steinhoff went to the Banner Casa Grande Medical Center with her immediate family seeking treatment for COVID-19 symptoms.

98.     Upon arriving at Banner Health, Ms. Steinhoff informed hospital staff that she and her husband required an American Sign Language (hereinafter "ASL") interpreter to effectively communicate with medical professionals during the hospital visit.

99.     Banner Health refused to accommodate Ms. Steinhoff and her husband's needs and failed to provide an ASL interpreter during their hospital visit as required by law.

100.    Banner Health issued a bill to Ms. Steinhoff in the amount of $1853.00 for the services provided during her December 24, 2021 visit to Banner Health (hereinafter the "December 2021 Bill").

101.    In or around February or March 2022, Ms. Steinhoff contacted Banner Health via telephone and filed a complaint with its Patient Relations Service Center relating to its failure to provide her and her husband with an ASL interpreter.

102.    As a result, Ms. Steinhoff received correspondence from Cathy Olson, ADA/Discrimination Coordinator at Banner Health, dated March 23, 2022 stating that Banner Health "will write-off the expense of this visit.  Any monies paid by you or your insurance company will be reimbursed and no monies due."

103.    Furthermore, on or about March 29, 2022, Ms. Steinhoff received email correspondence from Ms. Olson with a billing statement for $0 indicating that the previously issued December 2021 Bill was written off, and Ms. Steinhoff no longer owed a debt to Banner Health.

104.    Despite informing Ms. Steinhoff that the balance for the December 2021 hospital visit would be written off and then providing her with an updated bill with a $0 balance, Banner Health began engaging the services of third-party debt collectors in an attempt to collect the debt for the December 2021 Bill.

105.    At all times relevant hereto, the debt at issue was primarily for personal, family, or household purposes.

106.    In or around May 2022, Ms. Steinhoff received a collection letter from H&R Accounts, Inc. attempting to collect $1280.07 of the $1853.00 total from Ms. Steinhoff for the December 21 Bill on behalf of Banner Health.

107.    In or around July 2023, Ms. Steinhoff received a credit monitoring alert that Wakefield added a collection account to her credit reports listing "Casa Grande Medial Center" as the original creditor.

108.    On or about July 25, 2023, Ms. Steinhoff contacted Wakefield via email disputing the collection account and requesting that Wakefield contact Banner Health

109.    On or about July 25, 2023, Ms. Steinhoff contacted Banner Health via email and inquired about separate debt collection letters she received from Wakefield attempting to collect debts on behalf of Emergency Physicians SW.

110.    On or about August 1, 2023, Jacqul Comercl, RN, BSN, Senior Claims & Litigation Management Specialist at Banner Health, responded to Ms. Steinhoff emails stating that "[w]hile Banner Health did write-offs of the facility charges related to your and your husband's December 2021 Banner Casa Grande Medical

23

Center Emergency Department encounters, the write-off did not include the provider charges, as Banner Health does not control the provider charges. Emergency Physicians SW bills for their providers." Once again, Banner Health communicated to Ms. Steinhoff that she did not owe a debt to Banner Health yet continued to engage third-party debt collectors to collect the December 2021 Bill.

111.    Wakefield reported two collection accounts on Ms. Steinhoff credit reports with Trans Union, Equifax and Experian:

      a.  Wakefield and Associates, Acct No. x7160 for $511 and original creditor as Casa Grande Medical Center (hereinafter "Wakefield Acct. No. 1").

      b.  Wakefield and Associates, Acct No. x7548 for $1280 and original creditor as Casa Grande Medical Center (hereinafter "Wakefield Acct. No. 2").

112.    In or around July 2022, Ms. Steinhoff submitted online disputes to the credit reporting agencies for Wakefield Acct. No. 1 as that was the only account that was reporting at that time (hereinafter "July Dispute").

113.    Upon information and belief, Trans Union, Equifax and Experian forwarded Plaintiff's July Dispute to Wakefield.

114.    Wakefield and credit reporting agencies failed to conduct a reasonable investigation, and instead continued reporting Wakefield Acct. No. 1 on her credit reports after the July Dispute.

115.     On or about September 27, 2023, Ms. Steinhoff mailed written dispute letters to the Trans Union, Equifax, Experian and Wakefield disputing Wakefield Acct. No. 1 and Wakefield Acct No. 2.  With her disputes, Ms. Steinhoff provided Defendants with the March 23, 2022 correspondence from Banner Health stating that the expense of the visit will be written off and the March 29, 2022 billing statement indicating that the balance was $0 (hereinafter the "September Dispute").

116.     On or about October 9, 2022, Experian sent Ms. Steinhoff investigation results indicating that it deleted Wakefield Acct. No. 1 and Wakefield Acct No. 2 from her credit reports.

117.     On or about October 31, 2022, Trans Union sent Ms. Steinhoff investigation results indicating that it deleted Wakefield Acct. No. 1 and Wakefield Acct No. 2 from her credit reports.

118.     On or about October 27, 2022, Equifax sent Ms. Steinhoff investigation results verifying that Wakefield Acct. No. 1 and Wakefield Acct No. 2 are allegedly reporting correctly and indicating its intent to continue reporting the accounts on Plaintiff's credit reports.

119.     To date, Equifax and Wakefield continue to report Wakefield Acct. No. 1 and Wakefield Acct No. 2 on Plaintiff's credit reports.

120.     Defendants' derogatory and inaccurate reporting of the Wakefield Acct. No. 1 and Wakefield Acct No. 2 on Plaintiff's credit reports negatively reflects

upon Ms. Steinhoff's financial obligations, credit score and credit worthiness to existing and potential creditors.

121.    Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *See Pedro v. Equifax, Inc.*, 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *See Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *See Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *See Binns v. Ocwen Loan Servicing, LLC*, No. 14- 01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *See Rothman v. U.S. Bank Nat'l Ass'n*, No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *See Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *See Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit

scores ... are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *See Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

## COUNT I – VIOLATIONS OF FLA. STAT. §559.72(9) AGAINST BANNER HEALTH

122.   Plaintiff incorporates by reference paragraphs 2, 4-6, 8-9, 18 and 93-110 as if fully stated herein.

123.   At all relevant times to this action, Banner Heath is subject to and must abide by the laws of Florida, including Fla. Stat. §559.72.

124.   Banner Health violated Florida Statute § 559.72(9) by claiming, attempting, or threatening to enforce a debt when Defendant knew that the debt was not legitimate or asserting the existence of some other legal right when Defendant knew that right did not exist.

125.   Specifically, Banner Health engaged the services of H&R Accounts, Inc and Wakefield to collect the December 2021 Bill after Banner Health wrote off the entire amount and communicating to Ms. Steinhoff on multiple occasions that she did not owe a debt to Banner Health including an updated billing statement with a $0 balance.

126.   "Any person who fails to comply with any provision of   §559.72 is liable for actual damages and for additional statutory damages as the court may

27

allow, but not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff. In determining the defendant's liability for any additional statutory damages, the court shall consider the nature of the defendant's noncompliance with §559.72, the frequency and persistence of the non-compliance, and the extent to which the noncompliance was intentional." *See* Fla. Stat. §559.77(2) (emphasis added).

127.    As a result of Defendant's violations, Plaintiff suffered damages including but not limited to emotional distress and time spent addressing Defendant's illegal collection practices.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Banner Health actual damages, statutory damages, and punitive damages pursuant to Fla. Stat. §559.77; attorneys' fees, litigation expenses and costs of the instant suit; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT II – VIOLATIONS OF 15 U.S.C. §1681s-2(b) AGAINST WAKEFIELD

128.    Plaintiff incorporates by reference paragraphs 1, 3-6, 10-14, 18-28, 33-35, 37-45, 54, 60-63, 65-66, 68-73 and 107-121 as if fully stated herein.

129.    Wakefield is a furnisher under the FCRA because it provides consumer credit information concerning consumers to credit reporting agencies.

130.    Wakefield violated 15 U.S.C. §1681s-2(b) by failing to fully and properly investigate Plaintiff's July Dispute and September Dispute when it failed to review all relevant information provided by the credit reporting agencies.

131.    As a result of Wakefield's violations of the FCRA, Plaintiff has been damaged.

132.    Plaintiff's damages include damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

133.    Wakefield negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

134.    Additionally, Wakefield committed a willful violation of the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681n(a).

135.    Plaintiff is entitled to an award of prevailing party attorney's fees pursuant to 15 U.S.C. §1681.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Wakefield in the form of actual damages, statutory damages, punitive damages, Attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT III - VIOLATIONS OF 15 U.S.C. §1692e(2)(a)
## AGAINST WAKEFIELD

136.    Plaintiff incorporates by reference paragraphs 1, 3-6, 10-14, 18-23, 83-92 and 107-121 as if fully stated herein.

137.    A "debt collector" violates 15 U.S.C. §1692e(2)(a) by "[t]he false representation of the character, amount, or legal status of any debt."

138.    Wakefield engaged in a practice known as "debt parking" or "passive debt collection" by failing to provide Plaintiff with any notice that it was attempting to collect the alleged debt prior to reporting it to the credit reporting agencies.

139.    After Plaintiff placed Wakefield on notice that she was not responsible for the debt by communicating directly with Wakefield and through the credit reporting agencies in July and September 2023, Wakefield had no reasonable basis to continue to report Wakefield Acct. No. 1 and Wakefield Acct. No. 2 to the credit reporting agencies.

140.    Wakefield violated §1692e(2)(a) when it communicated false credit information to the credit reporting agencies by stating  that Plaintiff owes a debt in an attempt to coerce Plaintiff to pay the debt that she is not responsible to pay.

141.    Each month that Wakefield communicated false credit information regarding Plaintiff constitutes a violation of §1692e(2)(a).

142.    Additionally, Wakefield has violated §1692e(2)(a) each time the false credit information was viewed by a third party in connection with an account review, offer of credit, or application of credit. The FDCPA is a strict liability statute

and accordingly Wakefield's conduct need not have been intentional, Wakefield's conduct violated the FDCPA regardless of its intentions. See LeBlanc at 1190.

143.    Wakefield's conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. Id. at 1194 (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

144.    Wakefield, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(2)(a).

145.    15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

146.    As a result of Wakefield's violations, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Wakefield in the form of actual damages, statutory damages and punitive damages pursuant to 15 U.S.C. § 1692k; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and

further relief including as the Court deems equitable and just under the circumstances.

## COUNT IV - VIOLATIONS OF 15 U.S.C. §1692e(8) AGAINST WAKEFIELD

147.    Plaintiff incorporates by reference paragraphs 1, 3-6, 10-14, 18-23, 83-92 and 107-121 as if fully stated herein.

148.    A "debt collector" violates 15 U.S.C. §1692e(8) by "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."

149.    Wakefield engaged in a practice known as "debt parking" or "passive debt collection" by failing to provide Plaintiff with any notice that it was attempting to collect the alleged debt prior to reporting it to the credit reporting agencies.

150.    After Plaintiff placed Wakefield on notice that she was not responsible for the debt by communicating directly with Wakefield and through the credit reporting agencies in July and September 2023, Wakefield had no reasonable basis to continue to report Wakefield Acct. No. 1 and Wakefield Acct. No. 2 to the credit reporting agencies.

151.    Wakefield violated §1692e(8) when it communicated false credit information to the credit reporting agencies by stating  that Plaintiff owes a debt in an attempt to coerce Plaintiff to pay the debt that she is not responsible to pay.

Each month that Wakefield communicated false credit information regarding Plaintiff constitutes a violation of §1692e(8).

152. Additionally, Wakefield has violated §1692e(8) each time the false credit information was viewed by a third party in connection with an account review, offer of credit, or application of credit.

153. The FDCPA is a strict liability statute and accordingly Wakefield's conduct need not have been intentional, Wakefield's conduct violated the FDCPA regardless of its intentions. See LeBlanc at 1190.

154. Wakefield's conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. Id. at 1194 (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

155. Wakefield, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(8).

156. 15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

157. As a result of Wakefield's violations, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her

disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Wakefield in the form of actual damages, statutory damages and punitive damages pursuant to 15 U.S.C. § 1692k; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT V - VIOLATIONS OF 15 U.S.C. §1692e(10) AGAINST WAKEFIELD

158.    Plaintiff incorporates by reference paragraphs 1, 3-6, 10-14, 18-23, 83-92 and 107-121 as if fully stated herein.

159.    A "debt collector" violates 15 U.S.C. §1692e(10)  by "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

160.    Wakefield engaged in a practice known as "debt parking" or "passive debt collection" by failing to provide Plaintiff with any notice that it was attempting to collect the alleged debt prior to reporting it to the credit reporting agencies.

161.    After Plaintiff placed Wakefield on notice that she was not responsible for the debt by communicating directly with Wakefield and through the credit reporting agencies in July and September 2023, Wakefield had no reasonable basis to continue to report Wakefield Acct. No. 1 and Wakefield Acct. No. 2 to the credit reporting agencies.

162.    Wakefield violated §1692e(10) when it communicated false credit information to the credit reporting agencies by stating  that Plaintiff owes a debt in an attempt to coerce Plaintiff to pay the debt that she is not responsible to pay.

163.    Each month that Wakefield communicated false credit information regarding Plaintiff constitutes a violation of §1692e(10).

164.    Additionally, Wakefield has violated §1692e(10) each time the false credit information was viewed by a third party in connection with an account review, offer of credit, or application of credit.

165.    The FDCPA is a strict liability statute and accordingly Wakefield's conduct need not have been intentional, Wakefield's conduct violated the FDCPA regardless of its intentions. See LeBlanc at 1190.

166.    Wakefield's conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. Id. at 1194 (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

167.    Wakefield, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(8).

168.    15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

169.    As a result of Wakefield's violations, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Wakefield in the form of actual damages, statutory damages and punitive damages pursuant to 15 U.S.C. § 1692k; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VI – VIOLATIONS OF FLA. STAT. §559.72(9) AGAINST WAKEFIELD

170.    Plaintiff incorporates by reference paragraphs 1, 3-6, 10-14, 18-23, 93-96 and 107-121 as if fully stated herein.

171.    At all relevant times to this action, Wakefield is subject to and must abide by the laws of Florida, including Fla. Stat. §559.72.

172.    After Plaintiff placed Wakefield on notice that she was not responsible for the debt by communicating directly with Wakefield and through the credit reporting agencies in July and September 2023, Wakefield had no reasonable basis to continue to report Wakefield Acct. No. 1 and Wakefield Acct. No. 2 to the credit reporting agencies.

173. Wakefield violated Florida Statute § 559.72(9) by claiming, attempting, or threatening to enforce a debt when Defendant knew that the debt was not legitimate or asserting the existence of some other legal right when Defendant knew that right did not exist.

174. Specifically, Wakefield communicated false credit information about Plaintiff.

175. "Any person who fails to comply with any provision of §559.72 is liable for actual damages and for additional statutory damages as the court may allow, but not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff. In determining the defendant's liability for any additional statutory damages, the court shall consider the nature of the defendant's noncompliance with §559.72, the frequency and persistence of the non-compliance, and the extent to which the noncompliance was intentional." Fla. Stat. §559.77(2) (emphasis added).

176. As a result of Defendant's violations, Plaintiff suffered damages including but not limited to emotional distress and time spent addressing Defendant's illegal collection practices.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Wakefield actual damages, statutory damages, and punitive damages pursuant to Fla. Stat. §559.77; attorneys' fees, litigation expenses and costs of the instant suit; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VII - VIOLATIONS OF 15 U.S.C. §1681i
## AGAINST TRANS UNION

177.   Plaintiff incorporates by reference paragraphs 1, 4-6, 15, 18-20, 24-65, 67-70, 74-76, 107, 111-115, 117 and 120-121 as if fully stated herein.

178.   At all times relevant hereto, Trans Union is and was a "consumer reporting agency" as provided for under the FCRA.

179.   At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

180.   During the relevant time frame, Trans Union received Plaintiff's disputes regarding the accuracy or completeness of the Wakefield Acct. No. 1 appearing on Plaintiff's consumer disclosure.

181.   Trans Union violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein.

182.   Additionally, Trans Union unreasonably relied on information provided by Wakefield, when readily verifiable information was provided by Plaintiff in the disputes placing Trans Union on notice that Wakefield's credit information was inaccurate and unreliable.

183.   Trans Union's acts or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

184.    Alternatively, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

185.    As a result of Trans Union's FCRA violations, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Trans Union in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VIII - VIOLATIONS OF 15 U.S.C. §1681e(b) AGAINST TRANS UNION

186.    Plaintiff incorporates by reference paragraphs 1, 4-6, 15, 18-20, 24-65, 67-70, 74-76, 107, 111-115, 117 and 120-121 as if fully stated herein.

187.    At all times relevant hereto, Trans Union is and was a "consumer reporting agency" as provided for under the FCRA.

188.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

189.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

190.     Any users of credit reports that viewed the Wakefield account saw the inaccurate Wakefield Acct. No. 1.

191.     Even after Plaintiff's July Dispute, Wakefield Acct. No. 1 continued to report on Plaintiff's credit report(s) until October 2022.

192.     Trans Union's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

193.     In the alternative, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

194.     As a result of Trans Union's failures to comply with the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Trans Union in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the

jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT IX – VIOLATIONS OF 15 U.S.C. §1681i
## AGAINST EXPERIAN

195.    Plaintiff incorporates by reference paragraphs 1, 4-6, 16, 18-20, 24-65, 67-70, 77-79, 107 111-116, and 120-121 as if fully stated herein.

196.    At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

197.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

198.    During the relevant time frame, Experian received Plaintiff's disputes regarding the accuracy or completeness of the Wakefield Acct. No. 1 appearing on Plaintiff's consumer disclosure.

199.    Experian violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein.

200.    Additionally, Experian unreasonably relied on information provided by Wakefield, when readily verifiable information was provided by Plaintiff in the disputes placing Experian on notice that Wakefield's credit information was inaccurate and unreliable.

201.    Experian's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

202.    In the alternative, Experian negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

203.    As a result of Experian's violations of the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Experian in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances

## COUNT X– VIOLATIONS OF 15 U.S.C. §1681e(b) AGAINST EXPERIAN

204.    Plaintiff incorporates by reference paragraphs 1, 4-6, 16, 18-20, 24-65, 67-70, 77-79, 107, 111-116, and 120-121 as if fully stated herein.

205.    At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

206.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

207.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

208.    Any users of credit reports that viewed the Wakefield account saw the inaccurate Wakefield Acct. No. 1.

209.    Even after Plaintiff's July Dispute, Wakefield Acct. No. 1 continued to report on Plaintiff's credit report(s) until October 2022.

210.    Experian's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

211.    In the alternative, Experian negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

212.    As a result of Experian's failures to comply with the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Experian in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and Such other and further relief including as the Court deems equitable and just under the circumstances.

<strong><u>COUNT XI – VIOLATIONS OF 15 U.S.C. §1681i<br>AGAINST EQUIFAX</u></strong>

213.    Plaintiff incorporates by reference paragraphs 1, 4-6, 17, 18-20, 24-65, 67-70, 80-82, 107, 111-115 and 118-121 as if fully stated herein.

214.    At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

215.    At all times relevant hereto, Plaintiff is and was a "consumer" as provided for under the FCRA.

216.    During the relevant time frame, Equifax received Plaintiff's July Dispute and September Dispute regarding the accuracy of Wakefield Acct. No. 1 and Wakefield Acct. No. 2 on Plaintiff's credit report.

217.    Equifax violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein.

218.    Additionally, Equifax unreasonably relied on information provided by Wakefield, when readily verifiable information was provided by Plaintiff in the

disputes placing Equifax on notice that Wakefield's credit information was inaccurate and unreliable.

219.    Even after Plaintiff's July Dispute and September Dispute the Wakefield Acct. No. 1 and Wakefield Acct. No. 2 are still being reported on Plaintiff's credit report(s).

220.    Equifax's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

221.    In the alternative, Equifax negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

222.    As a result of Equifax's violations of the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Equifax in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances

## COUNT XII– VIOLATIONS OF 15 U.S.C. §1681e(b)
## AGAINST EQUIFAX

223.   Plaintiff incorporates by reference paragraphs 1, 4-6, 17, 18-20, 24-65, 67-70, 80-82, 107, 111-115 and 118-121 as if fully stated herein.

224.   At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

225.   At all times relevant hereto, Plaintiff is and was a "consumer" as provided for under the FCRA.

226.   During the relevant time frame, Equifax received Plaintiff's July Dispute and September Dispute regarding the accuracy of the Wakefield Acct No. 1 and Wakefield Acct. No. 2 on Plaintiff's credit report.

227.   Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

228.   Any users of credit reports that viewed the Wakefield account saw the inaccurate Wakefield Acct. No. 1 and Wakefield Acct No. 2.

229.   Even after Plaintiff's July Dispute and September Dispute, Wakefield Acct. No. 1 and Wakefield Acct No. 2 continue to report on Plaintiff's credit report(s).

230.    Equifax's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

231.    In the alternative, Equifax negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

232.    As a result of Equifax's failures to comply with the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Wakefield account remaining on her credit report(s) following her dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff, prays this Honorable Court to enter the following relief against Equifax in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and Such other and further relief including as the Court deems equitable and just under the circumstances.

## JURY DEMAND

233.    Plaintiff demands a trial by jury on all issues so triable.


Dated: April 17, 2024                    *Respectfully submitted,*

                                         **SHARMIN & SHARMIN, P.A.**

                                         */s/ Eiman Sharmin*
                                         Eiman Sharmin, Esq.
                                         eiman@sharminlaw.com
                                         FBN: 716391
                                         830 North Federal Highway
                                         Lake Worth, FL 33460
                                         Main: 561-655-3925
                                         Fax: (844) 921-1022
                                         *Attorneys for Plaintiff*